ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:17-CR-103-M |
| MELANIE MURPHEY (03) | |

## FACTUAL RESUME

In support of Melanie Murphey's plea of guilty to the offense in Count One of the indictment, Murphey, the defendant, Derek Staub, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the indictment, charging a violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347), that is, Conspiracy to Commit Health Care Fraud, the government must prove each of the following elements beyond a reasonable doubt:[1]

*First.*   That the defendant and at least one other person made an agreement to commit the crime of healthcare fraud as charged in the indictment;

*Second.*   That the defendant knew the unlawful purpose of the agreement; and

*Third.*   That the defendant joined in it willfully, that is, with the intent to further its unlawful purpose.

---

[1] *See* Fifth Circuit Pattern Jury Instruction 2.15A (5th Cir. 2015) (Conspiracy to Commit Offense, 18 U.S.C. § 371); *United States v. Njoku*, 737 F.3d 55, 68 (5th Cir. 2013) ("Section 371 requires proof of an overt act, which Section 1349 does not."); *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) (same).

**Factual Resume—Page 1**

The elements of Health Care Fraud, a violation of 18 U.S.C. § 1347, are as follows:[2]

> *First.* The defendant knowingly and willfully executed a scheme or artifice to defraud Medicare and Medicaid, health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain money and property owned by and under the custody and control of Medicare and Medicaid, by means of materially false and fraudulent pretenses, representations, and promises, in connection with payments for health care services, namely hospice services;
>
> *Second.* That the defendant acted with a specific intent to defraud a health care benefit program;
>
> *Third.* That the false or fraudulent pretenses, representations, or promises that the defendant used were material; and
>
> *Fourth.* That the operation of the health care benefit programs affected interstate commerce.

## STIPULATED FACTS

1. Melanie Murphey admits and agrees that in or around May 2012 and continuing through in or around October 2015, in the Northern District of Texas and elsewhere, she did knowingly, intentionally, and willfully combine, conspire, confederate, and agree with Bradley Harris, Amy Harris, Patricia Armstrong, Mark Gibbs, Laila Hirjee, Syed Aziz, Reziuddin Siddique, Charles Leach, Jessica Love, Ali Rizvi, Tammie Little, Jaclyn Pannell, Taryn Stuart, Slade Brown, Samuel Anderson, and others, to knowingly and willfully execute, and attempt to execute, a scheme and artifice: (a) to defraud Medicare and Medicaid, health care benefit programs as defined in 18

---

[2] Fifth Circuit Pattern Jury Instruction 2.59 (5th Cir. 2015) (Health Care Fraud, 18 U.S.C. § 1347).

U.S.C. § 24(b); and (b) to obtain money and property owned by and under the custody and control of Medicare and Medicaid, health care benefit programs as defined in 18 U.S.C. § 24(b), by means of materially false and fraudulent pretenses, representations, and promises, in connection with payments for health care services, namely hospice services, in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347).

2. Melanie Murphey worked for Novus Health Services, Inc. and Optim Health Services, Inc. (collectively Novus) from around May 2012 until around October 2015. The two Novus companies were operated as one: both were run from the same office by the same group of employees, and both were providers of hospice services to beneficiaries in the Northern District of Texas.

3. Murphey's title at Novus was "Director of Operations." Her responsibilities included collecting and responding to incoming correspondence, managing Novus's relationships with its physician medical directors, getting prescriptions filled, and ensuring that patient beneficiary medical charts were up to date. Co-defendant Bradley Harris was the Chief Executive Officer of Novus. Throughout her employment with both companies, Murphey reported directly to Bradley Harris. Murphey's responsibilities also included acting as a go-between between Bradley Harris and the nurses and physician medical directors who worked for Novus, many of whom were co-conspirators in the Novus fraud scheme. Murphey is not, and never has been, a licensed medical professional.

4. Murphey admits that she and co-conspirators defrauded Medicare and Medicaid by (1) admitting patient beneficiaries to Novus hospice service who were not

eligible for hospice service, yet billing Medicare and Medicaid for hospice stays and services as if the beneficiaries were eligible, (2) billing Medicare and Medicaid for hospice services that were either not provided to beneficiaries, were not directed by a doctor or other medical professional as required by Medicare, or were not supported by medical documentation and diagnoses as required by Medicare, and (3) billing Medicare and Medicaid for hospice services for beneficiaries for whom Novus had paid physicians, assisted living facilities, and others for hospice patient referrals. Murphey knew that purported "medical services" for which Novus billed Medicare and Medicaid were often directed by Bradley Harris. These directions included Bradley Harris's instructing nurses to intentionally overmedicate beneficiaries with medications such as hydromorphone and morphine with the intent to hasten their deaths.

5.   Murphey personally falsified a range of documents used to support the submission of false claims for hospice and continuous care hospice services. These false documents included physician's orders for medical services, physician certifications and recertifications of beneficiaries for hospice service, and "C2" prescriptions for Schedule II controlled substances such as hydromorphone or morphine.[3]

### Falsification of Medical Records and Physician Orders

6.   Novus used an electronic medical records (EMR) database hosted by a third party entity. Murphey and Bradley Harris accessed Novus's EMR database using the

---

[3] Murphey understands that "Schedule II controlled substances" refers to Schedule II controlled substances as defined and regulated by the Texas Controlled Substances Act, which is codified under Chapter 481 of the Texas Health & Safety Code.

credentials of defendant medical directors[4] Mark Gibbs, Syed Aziz, Reziuddin Siddique, and Charles Leach to create and sign forms certifying or recertifying that certain Novus patient beneficiaries were eligible for hospice care. Gibbs, Aziz, Siddique, and Leach all indicated to Murphey that they knew that Murphey or Harris completed their hospice beneficiary certifications or recertifications.

7. Murphey wrote physician certification narratives using the previous nurse's notes explaining why a beneficiary should be put or kept on hospice service. Murphey knew that by writing the physician narratives, and then electronically signing the certifications and recertifications using the log-in credentials of Novus's medical directors, she was falsely indicating that a licensed physician had performed the certifications and recertifications when that was not the case. Murphey knew that Medicare and Medicaid would only pay claims for hospice beneficiaries who had been certified for hospice service by a licensed physician, and that Bradley Harris and other co-conspirators used the certifications she falsified to submit claims for hospice care to Medicare and Medicaid for reimbursement.

8. Defendants Syed Aziz, Reziuddin Siddique, and Charles Leach each asked Murphey to use their EMR database account to complete hospice beneficiary recertifications without their input. Murphey would log-in to the EMR database as Aziz, Siddique, or Leach and complete their certifications, including signing them. Murphey saw Bradley Harris do the same thing for Mark Gibbs. Leach and Murphey had

---

[4] Medical directors were physicians contracted by Novus to purportedly oversee hospice beneficiary care.

Factual Resume—Page 5

conversations on the phone, at weekly Interdisciplinary Team, or "IDT," meetings, and in text messages where Leach made comments such as "just do them, I don't have time." Leach would text Murphey to have Murphey sign orders for medication or X-rays as well.

9. In addition to recertifying beneficiaries, Murphey logged into medical director EMR database accounts and electronically signed physician orders for those medical directors. Murphey falsified these orders at Bradley Harris's direction. Murphey knew that by electronically signing the orders, she was falsely indicating that the medical directors had given and approved the orders. Murphey did not take any steps to determine whether the medical directors had actually given the orders, and believed that in most cases the medical directors had not given the orders. Murphey knew that these falsified orders were used by her co-conspirators to create false records of hospice services for which Novus billed Medicare and Medicaid.

### Defendant Medical Directors Did Not Provide Patient Care

10. When Murphey first started working at Novus in 2012, Novus registered nurses, or "RNs," would call a newly-admitted beneficiary's medical director to discuss which medications the beneficiary should continue taking. Within about six months, or by the beginning of 2013, this changed. The RNs began to contact Bradley Harris instead of the medical directors, and Bradley Harris would decide which medications would be continued. Bradley Harris wanted to make these decisions because he did not want to continue patient beneficiaries on medications—for example, the medication Namenda—

that Novus would have to pay for as part of the hospice care for which it billed Medicare and Medicaid.

11. During Mark Gibbs's IDT meetings there was little discussion of patient beneficiary declines or stabilization, which meant that Gibbs had little basis to determine whether there had been any change in a beneficiary's end-of-life prognosis. Occasionally, an RN would push for discharge of one of Gibbs's patient beneficiaries from hospice care, but Gibbs would only agree to the discharge if it was approved by Bradley Harris.

12. Syed Aziz and Reziuddin Siddique alternated with each other in attending weekly IDT meetings for the same beneficiaries. Their IDT meetings would take less than an hour for more than a hundred beneficiaries. Murphey saw Aziz sleep during IDT meetings. Aziz also frequently used his phone to access the Facebook social media application rather than engaging in the meetings.

## Falsification of Written Physician Orders

13. Murphey prepared written physician orders that Novus medical directors Mark Gibbs, Syed Aziz, Reziuddin Siddique, and Charles Leach signed during IDT meetings. Murphey observed that the medical directors usually did not read the orders and just signed whatever she gave them. The falsified orders included orders to "evaluate and treat" beneficiaries for hospice service and orders to place beneficiaries on continuous care. Often, the orders indicated that a medical director had given a "verbal" order for medical services. Other times, the physician would sign an undated order that was later backdated to falsely indicate the physician had given the order at some earlier

date. In reality, it was Bradley Harris or other non-physicians at Novus who decided whether beneficiaries were "evaluated" for hospice care or placed on continuous care service.

14. Bradley Harris told Murphey that Novus needed to have a signed verbal admission form in a beneficiary's file within forty-eight hours of the beneficiary's admission to hospice. Bradley Harris instructed Murphey to ensure that the date of the pre-signed signatures matched the dates of admission. Murphey filled out the verbal admission forms as instructed by Bradley Harris. Defendant Jaclyn Pannell also filled out pre-signed verbal admission forms in this fashion. Neither Murphey nor, to her knowledge, Pannell ever attempted to contact the medical director who had pre-signed the forms to determine whether they had been contacted about admitting the beneficiary to hospice service. No medical director ever questioned Murphey regarding the use of the pre-signed verbal admission forms.

15. Murphey knew that by having the medical directors sign these orders at IDT meetings she was helping to create a false record indicating these services had been ordered by a physician when that was not the case. Murphey also knew that these falsified orders were used by others at Novus, including Bradley Harris, to bill Medicare and Medicaid for hospice services.

16. Bradley Harris also had medical directors pre-sign physician orders that Murphey used for ordering durable medical equipment (DME) for home health patients. Murphey used these forms to order CPAP and BiPAP machines at Bradley Harris's direction.

## Falsification of Hospice Face-to-Face Evaluation Forms

17. Murphey knew that Medicare regulations required that a physician periodically recertify hospice beneficiaries on the basis of a personal, or "face-to-face," evaluation performed by a physician or physician's assistant. Murphey helped falsify face-to-face forms that were then submitted to Medicare or Medicaid for claims reimbursement.

18. For example, on or about April 29, 2014, Bradley Harris emailed Murphey a list of beneficiaries who were past due for face-to-face recertifications, along with the dates that the face-to-face evaluations needed to have taken place and clinical narratives justifying the recertifications. According to Bradley Harris's instructions, Murphey faxed the information to defendant medical director Laila Hirjee, who returned the completed face-to-face forms to Murphey. The forms returned by Hirjee contained the narratives and dates provided by Harris along with Hirjee's signature. Bradley Harris typically asked Murphey and others to "white out" header information on faxes like these to conceal the fact that the face-to-face forms had been falsified.

19. Murphey observed Mark Gibbs go into Bradley Harris's office after IDT meetings to falsify face-to-face examinations. Gibbs used information from the last nurse's notes to fill out the face-to-face evaluation forms. Murphey observed Gibbs sign approximately 15 face-to-face forms during an IDT meeting. The forms had already been filled out with beneficiary recertification information.

## **Falsification of C2 Prescription Forms**

20. Murphey used C2 prescription forms that had been pre-signed by co-conspirator physicians to write prescriptions for controlled substances such as hydromorphone and morphine. Murphey would send the prescriptions to a pharmacy, where they would be delivered to patient beneficiaries' homes and ultimately administered to Novus patient beneficiaries by Murphey's co-conspirators without any physician supervision or direction. On multiple occasions, Bradley Harris directed Murphey to have C2 prescriptions filled. Murphey knew that Bradley Harris was a certified public accountant without any medical licenses. Murphey knew when she falsified the C2 forms that she was falsely representing that whichever physician's signature appeared on each form had ordered or written the prescription, and that these forms were used to support claims sent to Medicare and Medicaid.

21. Murphey first learned of the practice of pre-signing C2s at Novus when Bradley Harris provided her with C2s that had been pre-signed by Mark Gibbs and Laila Hirjee. Bradley Harris told Murphey to fill out the C2s if nurses called in for prescriptions. Eventually, Murphey had blank, pre-signed C2s from Gibbs, Hirjee, Aziz, Siddique, and Leach. Defendant Jaclyn Pannell went to IDT meetings and brought back blank C2s signed by the Novus medical directors. Murphey saw Gibbs sign blank C2's in Bradley Harris's office at Novus. Defendant Jessica Love informed Murphey that she also obtained pre-signed C2 prescriptions from Gibbs. Leach signed blank C2s in IDT meetings in front of Murphey and other Novus employees. Both Gibbs and Leach told Murphey that they were delegating to her the permission to write prescriptions on the C2s

that they had pre-signed. Murphey heard Gibbs complain that he was too busy to write C2s. Hirjee left pre-signed C2s under the doormat at her (Hirjee's) house for Bradley Harris or another Novus employee to pick up and give to Murphey at the Novus office. Murphey saw Aziz and Siddique sign blank C2s at IDT meetings.

22. In addition to filling out pre-signed C2s at Bradley Harris's direction, Murphey used the pre-signed C2s to respond to pharmacy requests for prescriptions that had been called in by Novus nurses. For example, if a Novus nurse called the pharmacy asking for a beneficiary prescription for hydromorphone, the pharmacy would fax a request to Novus for a physician-signed C2 prescription so that the pharmacy could provide the medication. Murphey would fill out a pre-signed C2 with beneficiary and medication information, and then fax the C2 to the pharmacy, which would then dispense the medication. Before Murphey took on the responsibility of filling out pre-signed C2s at Novus, this job was performed by Bradley Harris. Jaclyn Pannell also filled out pre-signed C2 forms, which were then used to obtain controlled medications from a pharmacy. Defendant Patricia Armstrong observed Murphey write pre-signed C2s without physician involvement and was therefore aware that this practice existed at Novus.

### Fraudulent Use of "Continuous Care"

23. Murphey understood that a hospice care provider could place a beneficiary on "continuous care," or "CC," which meant that the beneficiary could receive around-the-clock care from a licensed nurse or other medical professional. While an RN could initiate CC, they could only do so if they consulted with a physician and obtained a

physician's order to place the beneficiary on CC. A licensed vocational nurse, or "LVN," on the other hand, did not have the medical training necessary to make the decision to initiate CC. Medicare paid a higher rate for CC than for "routine" hospice care.

24. Medical directors at Novus were typically not involved in the initiation of CC for Medicare beneficiaries despite the requirement that they be so involved. RNs generally made these decisions without any consultation with a physician. If an RN was not available, Bradley Harris sent an LVN to initiate CC on a beneficiary. Bradley Harris first had defendants Patricia Armstrong or Tammie Little, who were both RNs, perform "triage" on the beneficiary over the phone by speaking with the family, the facility, or the non-CC LVN who was present. There were some CC LVNs who were uncomfortable with this arrangement because LVNs cannot make change-of-care decisions according to Texas Nursing Board rules. Bradley Harris told Murphey that the LVNs could initiate CC because of the initial "triage" that Armstrong or Little performed. LVNs frequently arrived to care for a beneficiary thinking an RN had examined the beneficiary already or would do so imminently, but this was not the case.

25. Bradley Harris wanted to place Novus hospice beneficiaries on CC as early as possible because Harris wanted to benefit from the higher billing rates for CC compared to routine care. Bradley Harris also used CC to hasten the deaths of beneficiaries that Harris thought had been on hospice for too long. If a beneficiary was on CC for three or four days without change, Bradley Harris instructed the CC nurses to give more medication to the beneficiary. Bradley Harris ordered an increase in whatever narcotic was being used, generally morphine, Dilaudid (i.e., hydromorphone), or Ativan.

If CC nurses were not medicating as Bradley Harris instructed, he replaced them with nurses who would follow his instructions. Bradley Harris ordered these increases in medication because he wanted the beneficiaries to die.

26. The majority of CC paperwork was completed by nurses in the field and kept in a binder for each beneficiary. After the beneficiary died, the CC nurses gave the binders to Murphey, who would give them to Bradley Harris. Bradley Harris then went through the binders and falsified whatever additional paperwork was needed to ensure that Novus could support claims to Medicare for the CC services. For example, Bradley Harris edited the nurses' logs to ensure that they showed that at least eight hours of CC care was provided, made sure that there were notes for each nurse who provided care, and that the necessary falsified doctor's orders were ready for medical directors' signatures. If there was no CC start order, Patricia Armstrong or another Novus employee would write one that was added to the binder. Initially, Bradley Harris took the unsigned CC orders to IDT meetings so that the medical directors could sign the falsified physician orders, but this responsibility ultimately became Murphey's. Often the medical directors did not date the orders they signed so that Bradley Harris or someone else could add the necessary dates later.

27. Murphey observed Mark Gibbs, Syed Aziz, Reziuddin Siddique, and Charles Leach sign falsified CC orders at IDT meetings without looking at their contents. Because the doctors were not paying attention to what they were signing, mistakes were made. On one occasion Murphey accidentally put a CC order for Charles Leach into the stack of orders that Mark Gibbs was supposed to sign, and Gibbs signed it. Bradley

Harris would become angry when these mistakes happened because the orders did not look right and would not support a Medicare claim.

### Falsification of "Do Not Resuscitate" Forms

28. While she was working at Novus, Murphey became a licensed notary at both Bradley Harris's and Amy Harris's requests. Amy Harris was also a notary. At some point Bradley Harris asked Murphey to notarize a blank "Out-Of-Hospital Do Not Resuscitate Order" or "DNR." A DNR is an agreed doctor's order, signed by both a doctor and hospice beneficiary, in which a hospice beneficiary agrees that, in the event of their incapacitation, they will not be medically resuscitated. Murphey knew that Texas law required that hospice beneficiary signatures on out-of-hospital DNR forms be either notarized, or signed in the presence of two witnesses who must also sign the order.[5] Murphey agreed to "pre-notarize" the blank DNR for Bradley Harris—that is, sign it as a notary without acknowledging any beneficiary's signature.

29. Murphey observed that defendant Amy Harris kept DNRs that Amy Harris had "pre-notarized"—that is, Amy Harris had apparently signed them without acknowledging any beneficiaries' signatures—and that were pre-signed by Novus medical directors. Amy Harris kept the pre-signed DNRs in a drawer in her office. Novus marketers knew about the pre-notarized, pre-signed DNRs, and would go into Amy Harris's office to get DNRs when they needed them to admit Medicare beneficiaries to Novus hospice service. Murphey also discovered in Amy Harris's office photocopies

---

[5] Murphey understands that this rule is codified in Texas Health & Safety Code § 166.082.

Factual Resume—Page 14

of the blank DNR she had signed for Bradley Harris, except that the date appeared to have been whited out on the original before the copies were made.

30. Amy Harris told Murphey that they (Amy Harris and Murphey) needed to "pre-notarize" blank DNRs to leave with hospice beneficiary families in case the beneficiary had to go onto CC or died. Amy Harris told Murphey that if there was no DNR in the home, then the beneficiary would have to call 911. Murphey knew that this was a concern for Amy Harris because if a beneficiary called 911 Novus would be responsible for all charges related to the emergency services.

31. After Novus's employees learned that Novus was under federal criminal investigation, Murphey saw a Novus employee confront Amy Harris about pre-signed DNRs that the employee found in Amy Harris's office. Amy Harris told the employee not to worry because she was going to get rid of them.

### **Destruction of Evidence**

32. The Novus owners and employees became aware of the government's investigation into Novus prior to the execution of a search warrant at Novus's offices in Frisco, Texas in September 2015. At some point prior to the warrant, Novus's management sent out a company-wide email instructing employees to refrain from destroying documents and physical seals were placed over the shredders in the office.

33. Sometime after the document hold was issued, but before the government executed its search warrant, Bradley Harris came into Murphey's office and told her that Jaclyn Pannell and Patricia Armstrong were going to come over to her house that night and that Armstrong would explain the purpose of the visit at that time. Armstrong and

Pannell came to Murphey's house with several electronic devices: Armstrong had a computer and Apple iPad, and Pannell had an Apple iPad and Apple iPhone. Armstrong explained to Murphey and Pannell that Bradley Harris had told her that the three of them had to "wipe" all of the information from their electronic devices. Murphey watched Armstrong reset her iPad to factory settings and saw her do something with the computer but could not say what. Neither Murphey nor Pannell wiped their devices at that time.

### Fraudulent Recruitment and Admission of Hospice Patient Beneficiaries

34. Murphey observed Amy Harris on the phone pretending to work for an insurance company to set up consultations for Novus with prospective Medicare beneficiaries for hospice service. Amy Harris was pretending to have a foreign accent during the call. Later, Bradley Harris came to Murphey's desk and told her to act like she had not heard Amy Harris's telephone conversation. Bradley Harris explained that Amy Harris and Tammie Little were working on a project.

35. A week or two later, Murphey discovered a pile of documents on her desk that she recognized as "face sheets." A face sheet is a summary of an individual's health and medical requirements commonly used in the medical industry. Each of the face sheets had the words "Express Medical" at the top. Bradley Harris told Murphey to check the Medicare coverage and begin hospice admission paperwork for each of the individuals for whom she had been given an Express Medical face sheet. Bradley Harris also told Murphey to list each of the beneficiaries as a referral from Tammie Little. Murphey also was aware of face sheets from a different third party company that were obtained by Patricia Armstrong.

36. In response to RN complaints that certain beneficiaries were ineligible for hospice or should come off of hospice service, Bradley Harris instituted a rule that a beneficiary could not be discharged before being monitored for a full certification period, at which point they would be discharged to Novus home health service. There were also instances when Bradley Harris ordered an RN to do an admission visit of a beneficiary without any order from a doctor to evaluate and treat the beneficiary for hospice. Two or three times per week, defendant Slade Brown, who was a Novus marketer, instructed Murphey to send an RN for an admission visit without a doctor's order for an evaluation. If the beneficiary was admitted, a medical director would sign a backdated order at a later IDT meeting.

## Conclusion

Murphey agrees that the she committed all the essential elements of the offense. This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support Murphey's guilty plea to Count One of the indictment.

AGREED TO AND STIPULATED on this 17th day of May, 2018.

ERIN NEALY COX
UNITED STATES ATTORNEY

_____
MELANIE MURPHEY
Defendant

RUSSELL W. FUSCO
Assistant United States Attorney
Texas State Bar No. 24069743
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Tel: 214-659-8600
Fax: 214-659-8805
Email: russell.fusco@usdoj.gov

_____
DEREK STAUB
Attorney for Defendant

Factual Resume—Page 18